# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

**Charles Francis Sabella**

   v.

**Frank Bisignano, Commissioner,**
**U.S. Social Security Administration**[1]

Case No. 1:25-cv-52-PB-AJ
Opinion No. 2025 DNH 146

## MEMORANDUM AND ORDER

    Charles Francis Sabella challenges the denial of his application for disability insurance benefits pursuant to 42 U.S.C. § 405(g). Sabella principally claims that the Administrative Law Judge (ALJ) improperly discounted evidence of his impairment by somatic symptom and depressive disorders. He accordingly moves for an order reversing the ALJ's decision, and the Commissioner, in turn, moves for an order affirming it. For the reasons stated below, I conclude that the ALJ's findings regarding Sabella's mental impairments are supported by substantial evidence and that his other arguments are without merit.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Frank Bisignano of the U.S. Social Security Administration is automatically substituted for former Acting Commissioner Michelle King. See Fed. R. Civ. P. 25(d).

# I. BACKGROUND[2]

## A. Procedural Facts

Sabella first applied for Social Security benefits in 2006, seeking disability insurance benefits and supplemental security income. Doc. 3-3 at 6. After his initial application was denied, see id., Sabella worked for ten years in various machinist and supervisor roles at TURBOCAM, a turbomachinery manufacturer. Doc. 3-2 at 49-50. Sabella applied again, this time only for disability insurance benefits, on October 26, 2020. Doc. 3-7 at 2. This time, he alleged a disability onset date of May 15, 2017, at which time he was 44 years old and had received a high school education through the eleventh grade. Id.; Doc. 3-8 at 7. His date last insured was December 31, 2022. Doc. 3-7 at 16.

Sabella's application was initially denied on February 18, 2021. Doc. 3-4 at 3. A telephonic hearing was held on February 15, 2022, at which Sabella was represented by counsel. Doc. 3-2 at 41-82. The ALJ issued a decision finding that Sabella was not disabled on March 30, 2022, reasoning that notwithstanding the severity of his obstructive sleep apnea, obesity, and chronic fatigue, his residual functional capacity (RFC) still allowed him to

---

[2]    The parties have submitted statements of material facts as required by Local Rule 9.1(b), and I draw on the entire administrative record to construct a brief factual history of Sabella's case. See Doc. 4-2; Doc. 6.

perform jobs existing in significant numbers in the national economy. Doc.
3-3 at 35-46.

On review, the Appeals Council remanded Sabella's application to the
ALJ. Id. at 54-56. In its order, the Appeals Council directed the ALJ to:
(1) further evaluate any functional limitations caused by Sabella's obesity;
(2) address a statement in a medical opinion by Dr. Denise Moquin, Psy.D.,
regarding Sabella's ability to sustain regular attendance at work that
conflicted with the ALJ's assessment of his RFC; (3) explain his basis for
concluding that Sabella's testimony about his daily activities contradicted his
testimony about the symptoms of his impairments; (4) further substantiate
its assessment of Sabella's RFC; and (5) if necessary, solicit additional
testimony from a vocational expert regarding the effect of Sabella's
limitations on his occupational base. Id.

Another hearing was held on August 29, 2023, at which Sabella, his
fiancé, a vocational expert, and a medical expert testified. Doc. 3-2 at 83-126.
The ALJ issued a new decision with the benefit of this testimony on
November 3, 2023, again concluding that Sabella was not disabled on largely
the same grounds as the first decision. Id. at 18-32. The Appeals Council
denied Sabella's request for review of this decision on December 4, 2024,
rendering it the final decision of the Commissioner. Id. at 2-4.

On January 31, 2025, Sabella filed the present action seeking reversal of the Commissioner's decision. Doc. 1 at 1-2.

## B.    Mental Impairments Evidence

To support his application for benefits, Sabella asserted a range of disabling physical and mental impairments. On appeal to this Court, Sabella's colorable arguments center on the ALJ's findings with respect to two mental impairments: somatic symptom disorder[3] and depressive disorder.[4] The ALJ's findings regarding these mental impairments were based on his evaluation of (1) office visit reports from Sabella's appointments with his primary care provider and neurologist; (2) a psychological profile

---

[3]    Somatic symptom disorder "is characterized by an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning." Somatic Symptom Disorder, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776 [https://perma.cc/494D-EA97]. These symptoms are usually "[u]nrelated to any medical cause that can be identified, or related to a medical condition . . . but more significant than what's usually expected." Id.

[4]    Depressive disorder "is a mood disorder that causes a persistent feeling of sadness and loss of interest." Depression (Major Depressive Disorder), Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/depression/ [https://perma.cc/QCX7-JNC7].

    In articulating his arguments regarding the ALJ's findings related to his asserted depressive disorder, Sabella occasionally references medical evidence that instead pertains to anxiety, without explaining its relevance. The analysis that follows assumes, favorably to Sabella, that evidence of the latter bears affirmatively on the former.

prepared in conjunction with Sabella's application by Dr. Moquin, a clinical psychologist; (3) a form medical source statement completed in support of Sabella's application; (4) assessments by state agency psychological reviewers during the benefits application process; and (5) testimony by a medical expert at Sabella's August 2023 hearing before the ALJ. Because these records and testimony form the basis of Sabella's challenge to the ALJ's decision, I review them in detail below.

     1.   Primary Care Provider Visits with Dr. Wilt

Sabella supplied the ALJ with office visit reports prepared by his primary care provider, Dr. Ray E. Wilt, III, D.O., for fifteen visits spanning July 2018 through May 2023. See Doc. 3-12 at 54-73, 76-131; Doc. 3-13 at 55-68, 73-84. Dr. Wilt's notes reflect his ongoing efforts to treat Sabella's chronic fatigue syndrome and fibromyalgia throughout this five-year period, but they are more mixed regarding Sabella's symptoms of and treatment for somatic symptom and depressive disorders. See generally Doc. 3-12 at 54-73, 76-131; Doc. 3-13 at 55-68, 73-84.

Beginning with depressive disorder, Dr. Wilt's notes reflect that in July 2018, Sabella exhibited a normal psychiatric appearance, mental status, and thought process, as well as a congruent mood and cooperative attitude. Doc. 3-12 at 57. Sabella likewise scored 0 on the Patient Health Questionnaire 2

(PHQ-2), a standardized depression screening.[5] Id. at 59. In December 2018,
however, Sabella scored 4 on the PHQ-2 and 19 on the PHQ-9,[6] and Dr. Wilt
issued a low-dose prescription for Wellbutrin[7] "to help [his] mood." Id. at
64-65. At his next visit in April 2019, Sabella reported that he tried but
stopped taking it after two months because of adverse side effects. Id. at 67.
Still, his PHQ-2 for this visit dropped back to 0, and Dr. Wilt's notes reflect a
normal psychiatric exam that day. Id. at 71-72. At a visit in July 2019, Dr.
Wilt again reported a normal psychiatric exam, though he added that

---

[5]    The PHQ-2 is a survey that screens for depression on a six-point scale
over as many questions. See Payne v. Colvin, 2016 WL 8674486, at *7 n.9
(D.N.H. May 20, 2016), R. & R. adopted by 2016 DNH 101, 2016 WL 3351004
(D.N.H. June 15, 2016). A score of four or greater is a positive screen for
depression. Id.

[6]    More comprehensive than the PHQ-2, the PHQ-9 is a module that
scores each of the nine DSM-IV criteria to measure the severity of depression.
Kurt Kroenke, Robert L. Spitzer & Janet B. W. Williams, The PHQ-9:
Validity of a Brief Depression Severity Measure, 16 J. Gen. Internal Med.
606, 607 (2001). The scores range from 0 to 27 and are divided into categories
of increasing severity: 0 to 4, 5 to 9, 10 to 14, 15 to 19, and 20 or greater. Id.
Here, Dr. Wilt appears to have administered the PHQ-9 to Sabella only when
Sabella scored a 2 or greater on the PHQ-2. Compare Doc. 3-12 at 59, 72, 89,
97, 103, 110, 117, 122, 130 and Doc. 3-13 at 61, 84 (only administering
PHQ-2) with Doc. 3-12 at 65, 82-83 and Doc. 3-13 at 67-68, 77 (administering
both PHQ-2 and PHQ-9).

[7]    Wellbutrin is a brand name for buprorpion, an oral aminoketone
antidepressant. Wellbutrin, Prescribers' Digital Reference,
https://www.pdr.net/drug-summary/?drugLabelID=237
[https://perma.cc/FCY2-TQZH].

Sabella's "mood [was] ok, mild depression and anxiety," and Sabella scored 2 on the PHQ-2 and 16 on the PHQ-9. Id. at 77, 81-83.

At all four of his appointments over the following eighteen months, Dr. Wilt's notes suggest that Sabella's symptoms of depression abated. See generally id. at 84-111. He continued to describe Sabella's psychiatric state as normal, and Sabella scored 0 on all but one of his depression screenings (the anomaly being a score of 1 on the PHQ-2 in December 2019 because he indicated having "[l]ittle interest or pleasure in doing things" on "several days," id. at 97). See generally id. At a visit in September 2020, Dr. Wilt even noted that Sabella "state[d] he is not depressed no anxiety." Id. at 105.

In January 2021, Dr. Wilt wrote that Sabella was "interested in medicines to help with anxiety" at his visit, yet noted that "he d[id] not display any anxiety." Id. at 112. Sabella scored 0 on his PHQ-2 for that appointment. Id. at 117. Still, Dr. Wilt added anxiety to the "Diagnoses" section of his notes, suggested that Sabella resume taking Wellbutrin, and referred him to a psychiatrist. Id. at 112, 116. Dr. Wilt's notes continue to show a prescription for Wellbutrin at Sabella's three visits over the following year, stretching through February 2022, at which point Dr. Wilt noted that

"[h]is mental health seems to be doing well."[8] Id. at 118, 124; Doc. 3-13 at 58.

Indeed, at all three of those visits, Sabella continued to score 0 on his depression screenings. Doc. 3-12 at 122, 130; Doc. 3-13 at 61.

At a November 2022 visit, however, Sabella's PHQ-2 and PHQ-9 scores spiked to 6 and 26, respectively, and Dr. Wilt's notes include an instruction to "[r]estart" Wellbutrin and "[c]onsider talking with a counselor or therapist in the future." Doc. 3-13 at 63, 67-68. Similarly, Sabella scored 4 and 21 on the PHQ-2 and PHQ-9 at his February 2023 visit, and Dr. Wilt's notes read, "[History] of depression 2 weeks ago, now on Wellbutrin just started a few days ago." Id. at 74, 77. Sabella also reported being on a waitlist to see a psychiatrist at the time. Id. at 74. By his next appointment in May 2023, Sabella reported having seen a therapist and a psychiatrist, and Dr. Wilt noted that "his mood has been doing okay he has been recently diagnosed with anxiety and PTSD." Id. at 81. Sabella's PHQ-2 score at that visit fell back to 0. Id. at 84.

Significantly, at every visit in the record save for three, the "Review of Systems" section of Dr. Wilt's notes shows that Sabella "denie[d]"

---

[8]    Dr. Leslie Suranyi, M.D., a neurologist to whom Dr. Wilt referred Sabella for evaluation of some of his physical symptoms, stated in her notes from his visit with him during this period that Sabella's "psychiatric evaluation . . . was negative." Doc. 3-12 at 232.

experiencing any psychiatric symptoms, namely "anxiety," "depression," "memory loss," and "thoughts of hurting/killing yourself." See Doc. 3-12 at 56, 62, 69, 79, 85, 93, 101, 107, 114, 121, 128; Doc. 3-13 at 60; but see Doc. 3-13 at 66, 75-76, 82. Notably, however, this section of Dr. Wilt's notes ubiquitously shows that Sabella "report[ed]" other, non-psychiatric symptoms, including "body aches," "post nasal drip," "heartburn," "change in vision," "lack of energy," "weight loss," and "weight gain." See, e.g., Doc. 3-12 at 55, 62, 69, 79.

Somatic symptom disorder, on the other hand, first appears in Dr. Wilt's notes in July 2019. Id. at 77. At that time, he wrote "[q]uestion of somatoform disorder" in his notes and stated that Sabella "feels as though he cannot work in any capacity." Id. Dr. Wilt suggested that Sabella see a therapist or psychiatrist for treatment, and he added somatic symptom disorder to the "Medical History," "Problems," and "Diagnoses" sections of his notes. Id. at 77-78, 81-82. At Sabella's next visit in November 2019, however, Dr. Wilt dropped somatic symptom disorder from the latter two sections, leaving it only in the "Medical History" section. Id. at 84, 87-89. It did not reappear in Dr. Wilt's notes again until January 2021, when Sabella reported that a social worker had diagnosed him with somatic symptom disorder, at which point Dr. Wilt relisted it in the "Diagnoses" section. Id. at 112, 115. Still, Dr. Wilt noted that Sabella "had a negative work-up otherwise," id. at

112, and at his next visit in March 2021, he again removed the diagnosis, id. at 122.

The ALJ, for his part, generally credited Dr. Wilt's characterizations of Sabella's longitudinal care, accepting both his diagnoses of somatic symptom and depressive disorders as well as his reports of normal psychiatric exams and depression screenings. See Doc. 3-2 at 21-22. The ALJ also took note of Dr. Wilt's "highly conservative" treatment approach, calling attention to Sabella's low-dose Wellbutrin prescription and lack of inpatient hospitalizations. Id. at 22.

2.   Comprehensive Psychological Profile by Dr. Moquin

Dr. Moquin, whose report was the partial subject of the Appeals Council's remand order, conducted a virtual examination of Sabella on January 27, 2021. Doc. 3-11 at 210. During the exam, Dr. Moquin observed that Sabella spoke in a "tangential" and "overly detailed" manner, that he "perseverated on illness," and that he was, "at times, flippant." Id. at 211. Dr. Moquin described Sabella's affect as "dysphoric." Id. Still, Sabella scored 28 out of 28 on the Folstein Mini-Mental State Examination,[9] and Dr. Moquin

---

[9]   The Folstein Mini-Mental Status Examination is a test commonly used to grade a patient's cognitive state. Marshal F. Folstein, Susan E. Folstein & Paul R. McHugh, "Mini-Mental State": A Practical Method for Grading the Cognitive State of Patients for the Clinician, J. Psychiatric Res., Nov. 1975, at 189-98. The mean score for "normal" individuals is 27.6. Id. at 191.

noted that his "[o]rientation, immediate and delayed recall, attention and concentration, receptive language, and verbal expressive language appeared intact." Id.

At the same visit, Dr. Moquin diagnosed Sabella with an "unspecified" somatic symptom disorder and an "unspecified" depressive disorder. Id. at 213. Nonetheless, she opined that Sabella's psychological symptoms do not affect his abilities to adequately "understand, recall, and apply information," "relate to and work with others," "focus attention on familiar work activities," or "regulate emotions and control behaviors in a work environment." Id. at 212-13. Rather, the only limitation on Sabella's functions that Dr. Moquin identified was that, in her view, "he likely is not able to sustain an ordinary routine and regular attendance at work." Id. at 212.

The ALJ found Dr. Moquin's opinion "somewhat persuasive" given that she personally examined Sabella and that her opinion is consistent with Sabella's own representations of engaging in various daily activities that require focus and concentration. Doc. 3-2 at 23. But as for her view on Sabella's ability to sustain a routine and attend work, the ALJ found Dr. Moquin's opinion not supported, both based on her failure to "support her opinion with evidence from her own report" and because of its inconsistency with testimony by medical expert Dr. Rafael Rivas-Vazquez, Psy.D., summarized below. Id.

3.    <u>Medical Source Statement by Mr. Corey</u>

Sabella also submitted a form Medical Source Statement of Ability To
Do Work-Related Activities (Mental), completed by Brian K. Corey, M.Ed. on
August 7, 2023.[10] <u>See</u> Doc. 3-13 at 43-46. On that form, Corey checked boxes
indicating that Sabella's impairments had a "[m]arked" or "[e]xtreme" effect
on nearly every listed work-related cognitive activity. <u>See</u> id. at 43-44. These
activities included understanding, remembering, carrying out, and making
judgments related to simple and complex instructions; interacting
appropriately with supervisors and co-workers; and responding appropriately
to usual work situations and to changes in work settings. <u>See</u> id. The lone
exception to Corey's severe appraisals was his assessment of Sabella's ability
to interact appropriately with the public, which Corey indicated was only
"[m]oderate[ly]" impaired. <u>Id.</u> at 44.

In support of his assessment, Corey described Sabella as having been
diagnosed with post-traumatic stress disorder "with high anxiety and
depression" and chronic fatigue syndrome as early as 2008. <u>Id.</u> at 46. He
wrote that Sabella "has been impacted in every area of his life" by these

---

[10]    Corey did not indicate the nature of his relationship with Sabella in the
document, though another provider in the record describes Corey as "his
therapist," Doc. 3-13 at 4, and Sabella listed Corey as one of his "doctors" who
he sees "every Wed + Fri since 3-13-23" on a medical update form requested
by the Commissioner on March 20, 2023, Doc. 3-9 at 22.

diagnoses and that he "distresses memories and dreams about" unspecified past traumatic experiences. Id. Asked to identify the effect of Sabella's impairments on any other of his capabilities, Corey answered, "[I]t is my professional opinion that due to the physical and mental response to all of these long-term conditions all aspects of Charle's [sic] life has been and continues to be negatively affected." Id. at 44, 46.

The ALJ found Corey's opinion "less persuasive," reasoning that the limitations he ascribed to Sabella were "excessive," unsupported by Dr. Wilt's notes, and unsupported by Sabella's medical record overall. Doc. 3-2 at 23. The ALJ also noted that Corey's opinion postdates Sabella's date last insured by a year. Id.

### 4.    State Agency Assessments by Drs. Stenslie and Schneider

The ALJ found "generally persuasive" the opinions of two state agency psychological reviewers, Drs. Craig E. Stenslie, Ph.D., and Michael Schneider, Psy.D., rendered during the benefits application process. Id.; see Doc. 3-3 at 16-17, 26-27. Upon initial consideration of Sabella's application, Dr. Stenslie concluded that, notwithstanding Dr. Moquin's diagnoses of somatic symptom and depressive disorders based on Sabella's "somatic preoccupation and a bit of low mood" at his visit with her, Sabella's symptoms of those diagnoses were "minimal." Id. at 17. Dr. Schneider affirmed this

finding upon reconsideration, noting that intervening treatment notes were consistent with the same conclusion. Id. at 27.

The ALJ credited these opinions based on the "mental health specialization of these doctors" and their consistency with Sabella's admission "that he remains capable of a number of related tasks, including mental aspects involved with personal care, driving short distances, and playing video games." Doc. 3-2 at 23.

5.   Medical Expert Testimony by Dr. Rivas-Vazquez

After reviewing Sabella's medical record, Dr. Rivas-Vazquez testified as a medical expert on the nature and severity of Sabella's mental health impairments at the August 2023 hearing before the ALJ. See id. at 88-100. Based on his review, Dr. Rivas-Vazquez testified that Sabella's mental impairments are non-severe. See id. at 92. His testimony focused on significant inconsistencies in the characterization of mental impairments throughout the medical record, contrasting the mentions of Sabella's somatic symptom disorder and anxiety with his predominantly 0-scores on depression screenings and the internally contradictory references to anxiety in Dr. Wilt's reports. Id. at 91-92. In particular, Dr. Rivas-Vazquez drew attention to the disjuncture between Dr. Wilt's notes on Sabella's self-reported symptoms and his prescribed treatment. Id. at 96-97. For example, Dr. Rivas-Vazquez noted that at Sabella's March 2021 visit, Dr. Wilt referred him only for treatment of

chronic fatigue syndrome, despite other notes from that day referencing anxiety. Id. The explanation for this disparate treatment, Dr. Rivas-Vazquez posited, is that Dr. Wilt concluded that Sabella's anxiety was already adequately managed by his Wellbutrin prescription. Id. at 97. Separately, Dr. Rivas-Vazquez also questioned the basis for Corey's statement that Sabella was diagnosed with post-traumatic stress disorder, testifying that he "saw no indication of that through the record." Id. at 92.

The ALJ "accepted" Dr. Rivas-Vazquez's testimony as "persuasive." Doc. 3-2 at 22-23. In making this determination, the ALJ emphasized Dr. Rivas-Vazquez's access to the most complete record of any medical sources, as well his ability to question Sabella directly and observe the August 2023 hearing; his specialization in psychology and knowledge of the benefits application process; his "detailed explanation for his conclusions" with citations to the medical record; and the consistency of his testimony with "the nature and frequency of [Sabella's] treatment history." Id. at 22-23. Accordingly, the ALJ "accounted for" Dr. Rivas-Vazquez's testimony "as a significant factor" in his reasoning. Id. at 23.

## C.  **The Five-Step Sequential Analysis and ALJ Decision**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner must follow a five-step sequential analysis. 20 C.F.R. § 404.1520. If the claimant has met his burden at steps one through four, the burden then shifts to the Commissioner at step five. Id. § 404.1560(c)(2).

At step one, the ALJ considers whether the claimant's present "work activity" constitutes "substantial gainful activity." Id. § 404.1520(a)(4)(i). If so, the claimant is "not disabled regardless of [his] medical condition or [his] age, education, and work experience." Id. § 404.1520(b). Here, the ALJ determined that Sabella had not engaged in substantial gainful activity from his alleged disability onset date through his date last insured. Doc. 3-2 at 20.

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or "combination of impairments" that have lasted or are expected to last for at least a year which "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii), (c). If the claimant lacks an impairment of such severity, he is not disabled. Id. § 404.1520(a)(4)(ii). If the claimant has at least one, however, he proceeds to step three. See id. Here, the ALJ concluded that Sabella suffers from three impairments of qualifying severity: obstructive sleep apnea, chronic fatigue, and obesity. Doc. 3-2 at 21.

At step three, the ALJ considers whether the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P which has lasted or is expected to last for at least a year. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If the claimant suffers from such an impairment, he is disabled. Id. § 404.1520(a)(4)(iii). Here, the ALJ found that none of Sabella's impairments met or equaled a listed impairment. Doc. 3-2 at 25.

At step four, the ALJ determines the claimant's RFC "based on all the relevant medical and other evidence" in the record. 20 C.F.R. § 404.1520(e). Based on that assessment, the ALJ determines whether the claimant "can still do [his] past relevant work." Id. § 404.1520(a)(4)(iv), (f). If so, the claimant is not disabled. Id. In undertaking this analysis, the ALJ considers "all the relevant medical and other evidence," id. § 404.1520(e) (emphasis added), including that of "medically determinable impairments that are not 'severe'" under step two, id. § 404.1545(a)(2). Here, the ALJ found Sabella capable of performing

> light work as defined in 20 C.F.R. [§] 404.1567(b) allowing for standing and walking no more than two hours in an eight-hour day; no climbing ladders, ropes, and scaffolds; occasional climbing ramps and stairs, balancing as defined in the Selected Characteristics of Occupations (SCO), stooping, kneeling, crouching, and crawling; and no concentrated exposure to unprotected heights, moving mechanical parts, humidity, and dusts, odors, fumes, and pulmonary irritants.

17

Doc. 3-2 at 25. The ALJ then determined that Sabella could not perform his past relevant work. Id. at 30.

At step five, the ALJ considers whether, given the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. Id. The Commissioner bears the burden of proving "that other work exists in significant numbers in the national economy that [the claimant] can do." Id. § 404.1560(c)(2). Here, the ALJ inquired of a testifying vocational expert whether a hypothetical individual with Sabella's RFC, age, education, and work experience "could perform other work in the national economy." Doc. 3-2 at 120. The vocational expert gave three examples of jobs that such an individual could perform: "small product assembler," with 28,000 jobs available; "electronics worker," with 9,600 jobs available; and "touch-up screener," with 2,600 jobs available. Id. The ALJ accordingly concluded that the Commissioner's burden was met at step five and thus that Sabella was not disabled under the Social Security Act. Id. at 30, 32.

## II.  <u>STANDARD OF REVIEW</u>

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. 42 U.S.C. § 405(g). That review is limited, however, to "determining whether the [Commissioner] used

the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the Commissioner's findings of fact so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Hum. Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. But his findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation modified) (quoting Rodriguez, 647 F.2d at 222).

### III. ANALYSIS

Sabella asserts with variable clarity numerous errors throughout the ALJ's five-step sequential analysis. His most coherent arguments target the ALJ's treatment of the medical evidence regarding his asserted somatic symptom and depressive disorders, though for the reasons stated below, I conclude that these arguments are unavailing. Sabella also gestures at three additional arguments that I address thereafter, all of which are waived, meritless, or both.

### A. Mental Impairments

The principal issue raised by Sabella's appeal concerns whether the ALJ properly considered evidence of two of his asserted mental impairments: somatic symptom disorder and depressive disorder.[11] Because Sabella's benefits claim ultimately faltered at step five of the sequential analysis, the ALJ's treatment of this evidence bears only on its determination of Sabella's RFC.[12] I understand him to make two discernible arguments in contending

---

[11] Sabella also asserts in passing that the ALJ failed to address his claimed impairments of anxiety and post-traumatic stress disorder, but the only evidence that he cites for either besides his own testimony is Corey's medical source statement, which the ALJ properly discounted for reasons I explain in greater depth below.

[12] Sabella seems to train this argument on step two of the ALJ's analysis, focusing primarily on its finding that his somatic symptom and depressive disorders are non-severe. That framing misunderstands the incremental series of findings contemplated by the five-step sequential analysis. A

that the ALJ erred in this regard: first, that the ALJ should not have considered Dr. Rivas-Vazquez's expert testimony as it related to these impairments; and second, that the ALJ engaged in a "highly selective" review of Sabella's medical records to reach this conclusion. I address each argument in turn.

### 1.    Dr. Rivas-Vazquez's Testimony

Sabella categorically challenges the ALJ's decision to credit Dr. Rivas-Vazquez's testimony, which he treated as "a significant factor" in his analysis. Doc. 3-2 at 23. Sabella contends that the ALJ should have discredited Dr. Rivas-Vazquez's opinion to the extent it bore on the functional limitations caused by his asserted somatic symptom and depressive disorders. In pressing this argument, Sabella takes aim at the rigor of Dr.

---

claimant need only establish <u>one</u> severe impairment to proceed past step two. <u>See</u> 20 C.F.R. § 404.1520(a)(4)(ii). Any other impairments, even those not deemed "severe," remain required considerations for the ALJ at step four. <u>See</u> <u>id.</u> § 404.1545(a)(2)-(3); Sacilowski v. Saul, 959 F.3d 431, 440 (1st Cir. 2020) ("[E]ven a finding of non-severity does not relieve an ALJ of his obligation to consider a non-severe impairment's impact on a claimant's overall medical condition."); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Thus, because Sabella already established at least one severe impairment (three, in fact) and thus prevailed at step two, attempting to establish the severity of other, additional impairments would not carry his claim any further forward. Rather, to the extent that the ALJ failed to properly consider Sabella's evidence of other impairments, that error bears on how the ALJ factored that evidence into its RFC determination.

Rivas-Vazquez's reasoning, faulting him for considering Sabella's 0-scores on depression screenings and denials of anxiety despite their contemporaneous contradiction at times by Dr. Wilt's written comments in the same visit reports. Objecting to his qualification to opine on somatic symptom disorder, Sabella also points to Dr. Rivas-Vazquez's admission at the outset of his testimony that he "do[es not] typically treat somatization disorder" and "tend[s] not to see [it] in [his] practice." Id. at 89.

These objections miss the forest for the trees. Dr. Rivas-Vazquez engaged in a comprehensive review of Sabella's medical record and, as stated, the gravamen of his testimony amounted to his observation of substantial inconsistencies in Sabella's documented symptoms of and diagnoses with mental impairments. See id. at 90-92. This pattern of inconsistencies, in his view, suggests that Sabella's symptoms of the contested mental impairments were either minimal or adequately treated. For example, in his testimony, Dr. Rivas-Vazquez called attention to the contradictions in Dr. Wilt's visit reports, which sometimes identify anxiety as a health concern despite Sabella "deny[ing]" it in the "Review of Systems" section. See id. at 93-94. In his own words, Dr. Rivas-Vazquez took that "inconsistency" to "speak to a relatively low level of severity." Id. at 94. Similarly, Dr. Rivas-Vazquez opined that Dr. Wilt's referrals to specialists for other conditions such as chronic fatigue syndrome, but not for anxiety, suggests that the latter was "not so pressing

that it require[d] therapeutic intervention" and was instead "well managed" on Wellbutrin.[13] Id. at 97.

Indeed, the ALJ credited Dr. Rivas-Vazquez's testimony because his appraisal of inconsistency in the medical record was itself consistent with the abundant discrepancies throughout the medical record, especially in Dr. Wilt's visit reports. See id. at 23. The ALJ did not err in crediting Dr. Rivas-Vazquez's inference from those inconsistencies that any somatic symptom or depressive disorder, even if present, had a limited effect on Sabella's functional capacity.

To the extent that Sabella means to argue that the ALJ should have discredited Dr. Rivas-Vazquez's testimony for noting inconsistency with the "checklist[]" aspects of Dr. Wilt's notes because "[Sabella] never went over those things with Dr. Wilt," Doc. 4-1 at 12-13, his contention is belied by the other responses in those sections. Although Dr. Wilt consistently marked that

---

[13]    Sabella seems to cite his three-year use of Wellbutrin, and his sensitivity to alternative medications for depressive disorder, as evidence of his condition's severity. See Doc. 4-1 at 8. But Sabella's prescription, accompanied by the evidence in Dr. Wilt's notes that his symptoms of depressive disorder abate or enhance in parallel with adherence to his prescription, see Doc. 3-2 at 71-72; Doc. 3-13 at 63, 67-68, instead reasonably suggest that any functional limitations arising from the condition are amply mitigated when properly medicated. Cf. 20 C.F.R. § 404.1530 (requiring that claimant "follow treatment prescribed" absent "acceptable reason for failure to" do so).

Sabella "denie[d]" psychiatric symptoms in the "Review of Systems" section of his notes across all of Sabella's appointments, in at least three visits he marked that Sabella "reporte[d]" such symptoms, see Doc. 3-13 at 66, 75-76, 82, and he frequently marked other kinds of symptoms that Sabella "reporte[d]" at his visits (e.g., ophthalmological, gastrointestinal, and musculoskeletal problems) in the same section, see, e.g., Doc. 3-12 at 55, 62, 69, 79. This activity demonstrates Dr. Wilt's regular use of this section of his notes to document Sabella's conditions.

As for Sabella's attack on Dr. Rivas-Vazquez's qualifications, it is true enough that specialization is a relevant factor in determining the appropriate weight to afford a medical opinion like his. See 20 C.F.R. § 404.1520c(c)(4). However, Sabella does not identify a medical opinion in the record by someone with superior specialization in somatic symptom disorder to Dr. Rivas-Vazquez, who is otherwise undisputedly generally qualified to render an opinion on Sabella's mental impairments writ large as a clinical psychologist. See Doc. 3-13 at 94-109. Accordingly, I cannot conclude that the ALJ erred in crediting Dr. Rivas-Vazquez's testimony with respect to somatic symptom disorder.

2.    Overlooked Evidence

Interspersed throughout his brief, Sabella points to specific pieces of medical evidence that he contends were insufficiently addressed by the ALJ,

arguing that he ignored them and thus "engag[ed] in a highly selective review" of Sabella's medical records. Doc. 4-1 at 14. Not so.

First, Sabella laments the ALJ's treatment of Corey's medical source statement as "less persuasive," Doc. 3-2 at 23, but in doing so, Sabella only cites to Corey's and his own testimony to confirm the veracity of Corey's statements. The circularity of this argument makes it unavailing, and it leaves the ALJ's central basis for discounting their persuasiveness—their irreconcilable inconsistency with Dr. Wilt's visit reports—unaddressed. See id. And given the additional weight reasonably afforded to Dr. Wilt's characterizations given his far longer treatment relationship with Sabella, see 20 C.F.R. § 404.1520c(c)(3), the ALJ's refusal to credit Corey's uncorroborated disagreement with Dr. Wilt is not erroneous.[14]

---

[14]    In his reply brief, Sabella avers that the record is missing other documentation of his visits with Corey and asks me to remand his case to obtain those materials as additional evidence pursuant to 42 U.S.C. § 405(g). I reject this request for two reasons. First, Sabella failed to raise this deficiency sooner than in his reply brief, waiving the argument. See United States v. Mojica-Ramos, 103 F.4th 844, 849 n.3 (1st Cir. 2024) ("Arguments made for the first time in an appellate reply brief are ordinarily deemed waived, unless the appellant raised the argument in a reply because it was the earliest point when it was logical to do so." (citation modified)). Second, Sabella has not explained why he has good cause for failing to remedy the deficiency before the ALJ, which is a prerequisite for remand. See 42 U.S.C. § 405(g) (requiring "a showing that . . . there is good cause for the failure to incorporate [the] evidence into the record in a prior proceeding").

Second, Sabella criticizes the ALJ's consideration of his strong performance on the Folstein Mini-Mental State Exam in his examination with Dr. Moquin, noting that the test is not designed as a dispositive diagnostic tool. This argument is largely unmoored from the ALJ's larger reasoning, however, which in fact accounts for Dr. Moquin's affirmative diagnoses of somatic symptom and depressive disorders. See Doc. 3-2 at 23. Moreover, the ALJ endorsed Dr. Moquin's findings regarding Sabella's functional impairment for the most part, which is precisely what Sabella seems to acknowledge that the tool does test. See id. As to Dr. Moquin's affirmative impairment finding that Sabella "likely is not able to sustain an ordinary routine and regular attendance at work," Doc. 3-11 at 212, the ALJ did not err in declining to adopt this conclusion given its lack of support in her report and inconsistency with the medical opinions of Drs. Wilt, Rivas-Vazquez, Stenslie, and Schneider. See 20 C.F.R. § 404.1520c(b)(2), (c)(1)-(2) (treating "supportability" and "consistency" as "the most important factors" in determining the persuasiveness of a medical opinion).

Third and finally, Sabella accuses the ALJ of selectively plucking excerpts from Dr. Wilt's visit reports to support his assessment of Sabella's mental impairments. However, in picking through the ALJ's citations, Sabella wholly overlooks the ALJ's express preceding acknowledgment of Dr. Wilt's notes that support Sabella's asserted limitations from somatic

symptom and depressive disorders, see Doc. 3-2 at 21, and he does not

explain how the excerpts that he cites on appeal somehow demonstrate

functional limitations driven by those disorders beyond the evidence that the

ALJ considered.

     In summary, the ALJ properly evaluated the medical evidence

concerning Sabella's asserted mental impairments. Because substantial

evidence supports the ALJ's conclusion that these impairments do not affect

Sabella's RFC, he did not need to include any limitations stemming from

those conditions in either his RFC determination or in the hypothetical

questions he posed to the vocational expert.

**B.**   **Other Arguments**

    1.   Step Three

     Reaching for alternative grounds for reversal, Sabella assembles a

challenge to the ALJ's listings determinations at step three of the sequential

analysis. However, Sabella's challenge largely amounts to an unelaborated

enumeration of twenty medical conditions that he claims the ALJ did "not

acknowledge[]" in its decision. Doc. 4-1 at 18. He accompanies eighteen of

these conditions with no more than lists of paginated citations alongside

them that purportedly identify where in the record they are demonstrated.

But beyond drawing up this list, Sabella does not explain how the evidence at

the cited pages of the record would establish the criteria for a listings

designation or otherwise make any attempt to develop an argument beyond his conclusory assertion of error. As such, this "perfunctory" argument is waived as to those conditions. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed . . . .").

The lone listings designation for which Sabella makes a colorable attempt to satisfy its individual elements is Listing 12.07: "Somatic symptom and related disorders." See 20 C.F.R. Part 404, Subpart P, Appendix 1. However, this listing requires that the claimant establish "[e]xtreme limitation of one, or marked limitation of two," out of four delineated "areas of mental functioning." Id. And given the ALJ's well-founded conclusion above that Sabella is not functionally limited by somatic symptom disorder, it follows that he cannot establish any of the "extreme" or "marked" limitations delineated as required for this listing.

2.    Step Four

Sabella separately argues that the ALJ erred in determining that he has the RFC to conduct "light work" as defined in 20 C.F.R. § 404.1567(b) with certain additional limitations. Sabella only targets a narrow subset of

the ALJ's subsidiary factual findings that supported this conclusion—that is, the ALJ's determinations that Sabella drives when necessary, plays video games, and watches television. In support of this challenge, Sabella points to excerpts of his and his fiancé's testimony at the August 2023 hearing contradicting each of these findings. The ALJ, for his part, concluded as much based on Sabella's own attestations in his 2021 Function Report that he drives "if [he] absolutely ha[s] to" and that "everyday" he engages in pastimes such as "watching T.V." and "video games." Doc. 3-2 at 27; see Doc. 3-8 at 36-37.

Even if Sabella explained how these three factual disputes alone manage to upend the ALJ's entire step-four analysis and thus had not waived this argument, see Higgins, 194 F.3d at 260, the deference I must accord to the ALJ's findings of fact forecloses it in any event. Sabella merely presents a plain, unadulterated contradiction between two of his own statements in the record, and he does not explain why the ALJ should have credited his and his fiancé's favorable testimony at the August 2023 hearing over his own unfavorable representations in the 2021 Function Report. It is hard to imagine a more straightforward application of the time-worn principle that "the resolution of conflicts in the evidence . . . is for [the ALJ], not . . . for the courts." Purdy, 887 F.3d at 13 (citation modified) (quoting Rodriguez, 647 F.2d at 222).

3.    <u>Step Five</u>

Sabella finally argues that the ALJ's typographically-mistaken description of him as "50 years old, which is defined as a younger individual age 18-49, on the date last insured" warrants that his claim be "fully revaluted [sic]." Doc. 4-1 at 13-14. Having declined to explain the significance of this scrivener's error—even on reply—beyond vaguely alluding to the importance of remedying "any disadvantage incurred" from it, id. at 14, Sabella has waived this argument as well. See Higgins, 194 F.3d at 260; Zannino, 895 F.2d at 17.

Even if Sabella had not waived this argument, remand would be inappropriate here given the seemingly unprejudicial nature of the error. See Ward, 211 F.3d at 656 ("[A] remand is not essential if it will amount to no more than an empty exercise."). Here, the ALJ's error first arose in his written decision issued in November 2023. See Doc. 3-2 at 30. But the ALJ wholly based his that section of his decision on the vocational expert's testimony at the August 2023 hearing. See id. ("Based on the testimony of the vocational expert, the undersigned concludes . . . ."); see also id. at 118-22 (vocational expert testimony). And the vocational expert rendered its opinion in light of Sabella's correct testimony about his age at the same hearing. See id. at 110. Thus, the substance of the ALJ's step-five decision was

fundamentally based on Sabella's correct age, notwithstanding the unforced captioning error that made it into the ALJ's final draft.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Sabella's motion to reverse the decision of the Commissioner, Doc. 4, is denied, and the Commissioner's motion to affirm the decision, Doc. 7, is granted. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

December 18, 2025

cc:    Counsel of Record